(C. D. 665)

GENERAL ANILINE WORKS v. UNITED STATES

United States Customs Court, First Division

(Decided July 1, 1942)

*Eugene R. Pickrell* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Frank X. O'Donnell, Jr.*, and *Richard F. Weeks*, special attorneys), for the defendant.

*Lamb & Lerch* appearing as *amici curiae*.

Before WALKER and KEEFE, Judges

WALKER, Judge: The merchandise the subject of this suit against the United States is described on the invoice as Leuco Blue Green (Oxyethyloxy anthraquinone). It was classified by the collector under paragraph 28 (a) of the Tariff Act of 1930 as a leuco-compound and assessed with duty at the compound rate of 45 per centum ad valorem and 7 cents per pound. Protest was duly filed by the importer, claiming that the merchandise was properly classifiable as a coal-tar intermediate and dutiable under the provisions of paragraph 27 of the same act at the rate of 40 per centum ad valorem and 7 cents per pound.

By timely amendment of the protest and stipulation of counsel the issue has been narrowed down to a competition between the provision in paragraph 28 (a), *supra*, for—

Coal-tar products:
(a) All * * * leuco-compounds * * *.

and the following provisions of paragraph 27 (a) of the same act:

(1) * * * anthraquinone * * *.

  *       *       *       *       *    -    *       *

(3) all products, by whatever name known, which are similar to any of the products provided for in this paragraph or in paragraph 1651, and which are obtained, derived, or manufactured in whole or in part from any of the products provided for in this paragraph or in paragraph 1651;

  *       *       *       *       *       *       *

(5) all the foregoing products provided for in this paragraph, not * * * leuco-compounds * * * and not specially provided for in paragraph 28 or 1651 * * *.

It appears to be established by the evidence that the merchandise at bar is a derivative of anthraquinone otherwise entitled to classifica-

tion under paragraph 27, *supra*, unless it be found that it is in fact a leuco-compound, in which case, by the provisions of paragraph 27 (a) (5) it is excluded from classification thereunder. The sole issue, therefore, is whether or not the importation is a leuco-compound.

At the outset it may be said that there is a basic and irreconcilable difference between the meaning of the term "leuco-compound" as contended for by the plaintiff, and the meaning of the same term as contended for by the defendant.

Plaintiff contends that a leuco-compound according to the common understanding—

—is a compound obtained by the reduction of a dyestuff which upon oxidation is converted back into the original dyestuff. [Pl. brief, p. 24.]

"Reduction" means the addition of hydrogen, and in the case of leuco-compounds it appears that usually two atoms of hydrogen are added. In connection with anthraquinonoid leuco-compounds two of plaintiff's witnesses added the conditions that the added hydrogen atoms must be attached to the oxygen of the carbonyl or keto groups, and that the oxidation of the leuco-compound to the dyestuff must take place readily in the air. Oxidation removes the added hydrogen.

The reason for the requirement of the reversibility of the action of dyestuff-to-leuco compound-to-dyestuff is found in the mechanics of dyeing. Certain dyes which are insoluble in their dyestuff form can be reduced, by the addition of hydrogen, to the form of a leuco-compound, which either by itself or in connection with other agents will go into solution. The material to be dyed is subjected to the solution, and upon oxidation the dyestuff is reproduced in the material.

On behalf of the defendant it appears to be conceded that plaintiff's definition, including the added conditions, is correct for certain types of leuco-compounds, notably those of the vat types of dyes. It is, however, the Government's contention that it is not necessary in every case first to have a dyestuff which is reduced to the leuco form, but that in the case of certain compounds, of which the importation at bar is claimed to be one, the leuco-compound may be formed in an intermediate stage during the manufacture of the dyestuff, and that upon oxidation of the leuco-compound thus obtained the dyestuff is formed. Defendant agrees that the action of leuco compound-to-dyestuff must be a reversible one, the only difference in this regard being that plaintiff contends that a dyestuff must always exist before the leuco-compound is formed, while defendant maintains that the leuco-compound may exist before the dyestuff is formed.

The Government's position is that the merchandise at bar is the leuco-compound of an acetate silk dye known as Celliton Fast Blue Green B. Apparently it agrees with those of plaintiff's witnesses who stated that in anthraquinonoid leuco-compounds the added hydrogen atoms must be attached to the oxygen of the carbonyl or

keto groups, but denies that plaintiff has shown that such is not the case in the merchandise at bar. It likewise denies that it is a requirement of all leuco-compounds that they oxidize readily in the air, contending that in the case of certain leuco-compounds, including the merchandise at bar, the application of chemical oxidizing agents is necessary to effect the conversion into the dyestuff.

Summarizing the case for the plaintiff, it is contended that the merchandise at bar is not a leuco-compound for the following reasons:

(1) That its chemical structure is not that of a true leuco-compound, i. e., that the merchandise at bar does not contain two more active hydrogen atoms than its corresponding dyestuff, Celliton Fast Blue Green B, and it is not reduced at the carbonyl or keto groups, i. e., the extra hydrogen atoms are not attached to the oxygen of the carbonyl or keto groups.

(2) That a comparison of the imported compound and a leuco-compound made by reducing Celliton Fast Blue Green B shows them to differ in spectra, solubility, and appearance.

(3) That anthraquinonoid leuco-compounds are easily oxidized by the oxygen of the air to their parent dyes while the imported compound requires the use of chemical agents for this purpose.

(4) That under the common meaning of the term a leuco-compound can only be obtained by reduction of a dyestuff.

We will treat each of these points in order as given above.

Exhibits 1, 2, and 3 offered at the trial consist of samples of the imported merchandise, the first representing a sample used in analyses and tests by one of plaintiff's witnesses, Russell I. Baker, and the others by two of defendant's witnesses, Herbert C. Ekweiler and Frederic H. Adams. All of the witnesses called, three on behalf of the plaintiff, and four on behalf of the defendant, were chemists, and all were evidently well qualified in their field.

As the result of analyses and tests made by plaintiff's witness Baker he gave his opinion that the merchandise at bar is a dihydro of 1:4 dioxyethylamino 5:8 dioxyanthraquinone, and gave the following structural and empirical formulae of that product, which in memorandum form was admitted in evidence as illustrative exhibit A:

According to the witness the use of the article at bar is for conversion into an acetate silk dyestuff known as Celliton Fast Blue Green B, which has the chemical name 1:4 dioxyethylamino 5:8 dioxyanthraquinone, and the following structural and empirical formulae, as shown on illustrative exhibit K:

It will be noted that the difference between the formula of the merchandise at bar, illustrative exhibit A, and the formula of the dyestuff formed therefrom is two hydrogen atoms. By reducing Celliton Fast Blue Green B (i. e., adding hydrogen) plaintiff's witness Baker produced what he called the true leuco-compound of Celliton Fast Blue Green B. To this compound he gave the name 1:4 dioxy-ethylamino 5:8 dioxy 9:10 anthraquinol, and the structural and empirical formulae as follows shown on illustrative exhibit L:

It will be noted that the difference between the structural formulae of illustrative exhibit A, the product at bar, and that of illustrative exhibit L, claimed to be the true leuco-compound of Celliton Fast Blue Green B, is that in the former two hydrogen atoms are written outside the bracket which encloses the formula, while in the latter the hydrogen atoms are attached to the oxygen at the 9 and 10 position, or, in other words, at the carbonyl or keto groups. Plaintiff contends that the hydrogen is not so attached in the case at bar and as proof offers the testimony of witness Baker, who stated that he determined the active hydrogen atoms in exhibit 1 by means of reaction with methyl magnesium iodide, which liberated methane, a gas which can be measured to accurately determine the amount of hydrogen which has reacted with the methyl magnesium iodide. He found six active hydrogen atoms, and by the same method found six hydrogen atoms in Celliton Fast Blue Green B, and from this he concluded that exhibit 1 cannot be a leuco-compound as a true leuco-compound should have two more active hydrogen atoms than the dye from which it can be reduced.

The use of this method, known as Grignard's reagent, was stated by two of defendant's witnesses to be unreliable in the case of complex compounds such as the merchandise at bar. Furthermore, it is pointed out by the defendant that plaintiff's witness Baker synthesized a compound which he stated was identical with exhibit 1 from

anthraquinone, the details of the synthesis being illustrated by plaintiff's illustrative exhibits B to J, the final product being represented by illustrative exhibit A. If these exhibits, offered by plaintiff, and the details of the synthesis, as related by plaintiff's witness Baker, are correct, it is pointed out that the product represented by illustrative exhibit A must have eight active hydrogen atoms, and two of these would be attached to the oxygen of the carbonyl or keto groups.

It is further pointed out that there is no proof that the missing active hydrogen atoms, if any there be, are missing from the 9 and 10 positions. Government's witnesses noted that in drawing the formula for the imported product, illustrative exhibit A, the extra hydrogen atoms were placed outside the bracket, indicating that the chemist who drew it did not know where they belonged. It is a logical assumption, according to defendant's witnesses, that those atoms belonged at the 9 and 10 positions.

We are satisfied that the plaintiff has failed to prove by a preponderance in weight of the competent, relevant, and material evidence offered that the imported compound does not contain two more active hydrogen atoms than the dyestuff Celliton Fast Blue Green B, and that it has likewise failed to prove that the extra hydrogen atoms are not attached to the oxygen of the carbonyl or keto groups of the imported compound.

We now take up for consideration the second reason advanced by plaintiff why the imported compound is not a leuco-compound. This is based in part upon a spectrographic comparison made by one of plaintiff's witnesses of the imported material, exhibit 1, and the compound made by reduction of Celliton Fast Blue Green B, which plaintiff claims is a true leuco-compound of such dye. The witness stated that the spectrograms of the two were entirely different, whereas, he said, if both were leuco-compounds of Celliton Fast Blue Green B they would be alike. This difference is explained by witnesses for the defendant by stating that the imported product had been slightly oxidized either in manufacture or by auto-oxidation. Such oxidation, according to defendant's witnesses is a typical condition met either in the production or storage of leuco-compounds. By reason of this fact, they stated, spectrographic comparison with a completely reduced product of the dyestuff Celliton Fast Blue Green B would not yield the same curves. As proof of this defendant points to the fact that plaintiff's witness Baker reduced the imported product, exhibit 1, and compared its spectrographic curve with that of the leuco-compound of Celliton Fast Blue Green B and found the curves to be identical in absorption of light. This reduction of the imported compound overcame the effect of the slight oxidation.

This same explanation of partial oxidation is given as the answer to the fact pointed out by plaintiff that the leuco-compound made from Celliton Fast Blue Green B in solution in an alkaline medium is yellow brown in color, while exhibit 1 in a similar solution forms a dark blue partial solution. The blue color, it is explained by defendant's witnesses, is the result of partial oxidation, whereby the product takes on some of the color of the finished dyestuff. If a small amount of sodium hydrosulphite is added, which reduces the product, the yellow brown color is obtained. Partial oxidation, it was testified, is also the reason why the solubility of exhibit 1 is not the same as that of the leuco-compound made from Celliton Fast Blue Green B.

We are satisfied that defendant's explanation of the partial oxidation of the imported product accounts for the difference in spectra, appearance, and solubility between the imported product and the leuco-compound produced by reduction of Celliton Fast Blue Green B, and we are likewise satisfied that such partial oxidation did not remove it from the category of products known as leuco-compounds.

The third reason advanced by the plaintiff against classification of the imported article as a leuco-compound rests in the assertion that anthraquinonoid leuco-compounds are easily oxidized by air to their parent dyes, whereas exhibit 1 cannot be so oxidized. Each of plaintiff's witnesses stated this proposition, while two of defendant's witnesses stated that although it is true of anthraquinonoid leuco-compounds of the vat type it is not true of all anthraquinonoid leuco-compounds of the acetate silk type, and that the importation at bar falls into this latter class. It was pointed out by one of defendant's witnesses that oxidation of some leuco-compounds might take place so slowly in the air that for practical purposes it would be necessary to add oxidizing agents. This view is supported by the following from the discussion of leuco-compounds found in the article on "Dyes, Synthetic" in vol. 7, Encyclopaedia Britannica, 14th ed., p. 799:

> The facility with which the leuco-compounds derived from dye-stuffs of various classes are reoxidized to the original dye-stuffs varies with the structure, and is probably dependent upon whether the dye-stuff has an ortho-quinonoid or a para-quinonoid configuration. The leuco-compounds of indigo dyes, which must have an orthoquinonoid constitution, are readily oxidized by air, while those of the triphenylmethane, indophenol, and indamine classes, to which only a para-quinonoid structure can be ascribed, are fairly stable to atmospheric oxidation and require the application of a stronger oxidating agent, such as chromic, persulphuric, or permanganic acid, to restore their colour.

One of the authorities cited by plaintiff likewise indicates that not all leuco-compounds are oxidized by air into their corresponding dyestuffs. This is Bernthsen's Textbook of Organic Chemistry as revised by Sudborough (1930), which, on this point, states:

The oxidation of the leuco-compounds is often quickly effected by the oxygen of the air (e. g. in the cases of indigo white and of leuco-methylene blue); in the triphenylmethane group it is slower and frequently more complicated.

In view of the foregoing, we are of the opinion that the contention of the plaintiff on this point has not been established.

The final line of proof offered by plaintiff concerns itself with the definition, or common meaning, of the term "leuco-compound" as revealed by dictionaries, encyclopaedias, and textbooks, as well as the opinions of its witnesses. These definitions are relied on by the plaintiff to establish that a leuco-compound can only be the reduction product of a dyestuff, which, of course, requires the antecedent existence of the dyestuff.

It is clear that the authorities and witnesses are not in complete harmony on the question of the common understanding of the term. Thus, Funk & Wagnalls New Standard Dictionary (1933), Hackh's Chemical Dictionary (1929), Thorpe's Dictionary of Applied Chemistry, Supplement (1936), and Bernthsen's op. cit. state that leuco-compounds are colorless, while the article already cited on "Dyes, Synthetic" in the Encyclopaedia Britannica, as well as all of defendant's witnesses who were questioned on the subject, stated that the leuco-compounds of dyes of the anthraquinone group are colored.

Hackh's Chemical Dictionary limits the term to derivatives of triphenylmethane, and plaintiff's witness Herrmann limited it to the product obtained by chemical reduction of a vat dye. Both of these appear to be clearly in error.

The other authorities cited, and plaintiff's other two witnesses, apparently agree that the term leuco-compound covers a product obtained by reduction of a dyestuff, which, upon oxidation, reverts back to the original dyestuff. The point made by the defendant is not that such definition is incorrect—in fact, it is conceded to be correct for certain types of dyes—but that it is not broad enough. It is maintained by the defendant that in some cases, of which the importation at bar is one, the leuco form of a dyestuff may be made as a stage during the synthesis of the dyestuff before the final stage is reached. This leuco form, it is contended, may be oxidized into the dyestuff.

However, the mere fact alone that a product may be oxidized into a dye does not make it a leuco-compound under the defendant's contention. The action must be reversible. In plaintiff's brief an example of the reason for this necessity may be found in the reference to aniline, which, it is said, can be oxidized into a dye called Aniline Black, which dye, when reduced, produces a compound called leuco Aniline Black which has an entirely different structure than aniline. Aniline, therefore, would not be a leuco-compound.

The essential feature of defendant's contention as to the common meaning of the term, therefore, is the reversibility of the action. It matters not whether the original material started with is the dye or the leuco-compound, so long as the action is reversible.

As illustrating this fact defendant cites an example from the Textbook of Organic Chemistry by Holleman (1930), wherein, at page 493, referring to the formation of a triphenylmethane dyestuff the following is given:

The three stages necessary to the formation of the dyestuff can be defined as follows:

1. Formation of a *leuco-base*, a derivative of
$$HC(C_6H_4NH_2)_3$$
2. Formation of a *colour base* (colourless), a derivative of
$$HO \cdot C(C_6H_4NH_2)_3$$
3. Formation of the *dyestuff*, a derivative of
$$C \overset{\displaystyle C_6H_4NH_2,HCl}{\underset{\displaystyle C_6H_4:NH_2 \cdot Cl}{\underset{\displaystyle \|}{\overline{\phantom{C}}C_6H_4NH_2,HCl}}}$$

Reduction reconverts the dyestuff into their leuco-bases, two hydrogen atoms being added during the reaction.

Defendant's witness Wuertz referred to leuco quinizarin and the vat dyestuffs derived from benzanthrone as further examples of cases where it was not necessary to reach the dyestuff stage before having a leuco-compound.

We are satisfied that the term "leuco-compound" is not limited to reduction products of dyestuffs, as contended by plaintiff, but includes as well products such as the one at bar.

We conclude, after careful consideration of all the evidence before us, that the plaintiff has failed to establish by a preponderance in weight of competent, material, and relevant evidence that the importation at bar is not a leuco-compound within the meaning of that term as used in paragraph 28 (a) of the Tariff Act of 1930, and the claim made by the plaintiff is therefore overruled.

Judgment will issue accordingly.